PRESENT: Carrico, C.J., Compton, Hassell, Keenan, Koontz, and Kinser, JJ., and Whiting, Senior Justice

THE SCHOOL BOARD OF THE CITY OF PORTSMOUTH

v.   Record No. 982466

OPINION BY
SENIOR JUSTICE HENRY H. WHITING
September 17, 1999

LATASHA COLANDER

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
Johnny E. Morrison, Judge

In this appeal, we consider whether a high school student established a cause of action against a school board pursuant to 42 U.S.C. § 1983, which states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983 (emphasis added).

In 1995, the school administration at Wilson High School in Portsmouth discovered that, beginning in late 1991 or early 1992, John Crute, a teacher and women's track coach, had been secretly videotaping the plaintiff, Latasha Colander, and other members of the women's track team in various stages of undress in the women's locker room at the high school.

In 1996, after the plaintiff learned of Crute's activities, she filed this action asserting a number of claims under 42 U.S.C. § 1983 against Crute, the school board, the superintendent of schools, the principal, and the athletic director. She also filed common law claims against Crute, but those claims are not pertinent to our resolution of this appeal.

Prior to trial, the three school officials were dismissed on summary judgment.[1] At trial, Crute admitted liability. In returning verdicts against Crute and the school board, the jury awarded damages in the following sums: $43,000 in compensatory damages and $500,000 in punitive damages against Crute, and $250,000 in compensatory damages against the school board. Judgment was entered on the verdicts, and the school board appeals. Applying well-settled principles of appellate review, we will review the facts in the light most favorable to the plaintiff who is fortified with a jury verdict approved by the trial court.

In 1988 and 1989, more than two years before the secret videotaping that precipitated the present litigation

---

[1] Apparently, those three officials were not in office at the time of the acts giving rise to the alleged § 1983 liability.

2

began, Crute videotaped a number of team members in various track uniforms with their knowledge and consent. During this period, 14-year-old Lakesha Coletrain, a team member, agreed to Crute's request that she remain after track practice to be videotaped in her track uniform for a portfolio Crute said he was preparing for each girl. After the other members of the team had left the school, Coletrain went with Crute to a remote area of the school building where Crute videotaped her in eight different track uniforms.

Each time Coletrain changed uniforms, she went into a classroom and closed the door. Crute asked Coletrain to remove her underpants to change into one uniform that was cut high in the pubic area because he said that the uniform did not look good with the underpants. During the videotaping session, Crute instructed Coletrain to stretch her legs on the floor and over a hurdle. He told her that if the stretching hurt, she could grunt because it would not be heard on the videotape since he would talk over it.

Upon Coletrain's return home, her parents questioned her about the videotaping session and learned that Coletrain had been alone with Crute during the three to four hour period in which he videotaped her. The next day,

her father went to the school and demanded that Crute give him a copy of the tape, which Crute did the following day.

Both parents viewed the tape and the father testified that the tape "looked like it had just been spliced," and was "about a three-minute version" of the taping session. He also testified that the tape showed his daughter in eight different track uniforms that looked like bathing suits, that she had her leg propped up as if she were jumping a hurdle, that the camera was "zooming in on her crotch, zoomed in on her rear," that he heard Crute's voice in the background encouraging her to stretch her legs while in a stretching pose, and that Crute was also doing "a lot [of] moaning and groaning."

Upon hearing the Coletrains' complaint about the tape and Crute's conduct the next day, the superintendent of schools ordered Judith Kirman, the high school principal, to conduct an investigation to ascertain whether Crute had done anything objectionable or inappropriate. Crute furnished copies of the videotapes to Kirman and the school officials who assisted in the investigation. The investigators viewed a copy of each track member's tape during their separate interviews with most of the team members and their parents or guardians.

4

Although the Coletrains and another parent thought that Crute's actions were inappropriate, other parents did not. Kirman and the other school officials concluded that Crute had done nothing objectionable or inappropriate. In accordance with the school policy of "progressive discipline," no record of the incident was kept in Crute's personnel file because it was the first complaint against Crute and, upon investigation, it had been found to be groundless.

Nevertheless, upon terminating the investigation, Kirman ordered Crute to modify his past practices by (1) confining the videotaping of team members to "track meets when the girls were running," (2) taking a female chaperone to out-of-school-district track meets, and (3) refraining from driving team members home in his car after track practices. Although Crute violated the second and third orders on one or more occasions, there was no evidence that anyone was aware of his violation of the first order until the 1995 discovery of the secret videotaping.

It was then discovered that, beginning in late 1991 or early 1992, Crute had concealed one of the school's video cameras in a storage room adjoining the women's locker room. He used the camera to secretly videotape track members, including the plaintiff, changing their clothes.

5

The plaintiff's motion for judgment claims that Crute's actions were in violation of her "constitutional right to bodily security and integrity to be free from unjustified intrusions on her personal security, and to personal privacy." The plaintiff also alleged that the school board had knowledge of Crute's activity and of his "propensity to behave inappropriately towards the students under his direction and control based on prior complaints," yet "made and enforced a policy of allowing defendant Crute to continue his inappropriate behaviors by failing to take immediate and decisive action to end such conduct."

The school board has raised a number of questions on appeal, but we find dispositive issues concerning the school board's alleged violation of its duty to the plaintiff under § 1983 and the causal connection of that violation to the deprivation of the plaintiff's constitutional rights. The plaintiff claims, however, that we cannot reach these issues because the school board failed to raise them in the trial court. We disagree with that claim.

The record shows that in its motion to strike the plaintiff's evidence at trial, the school board cited Commissioners of Bryan County v. Brown, 520 U.S. 397 (1997), and argued as follows: "Congress did not intend to

6

impose liability on a municipality unless deliberate action attributable to [the] municipality itself is a moving force behind the plaintiff's deprivation of federal rights. . . .[I]t must be deliberate indifference on behalf of the school officials. . . .[T]he facts. . .cannot rise to the level of constituting an official policy of the School Board and a causal connection to a federal violation of the plaintiff's Constitutional rights. . . .There's been no deliberate indifference shown by anyone."  We think these statements were sufficient to preserve for appeal the issues we find dispositive, and we will proceed to the merits of the case.

The right of action advanced by the plaintiff arises under a federal statute.  Therefore, we apply federal jurisprudence in determining her rights.  Federal Deposit Insurance Corporation v. Mapp's Ex'r, 184 Va. 970, 974, 37 S.E.2d 23, 24 (1946); Southern Ry. v. Wilmouth, 154 Va. 582, 589, 153 S.E. 874, 876 (1930).  Although "municipalities and other local governmental bodies are 'persons' within the meaning of § 1983," a § 1983 plaintiff must show that the governmental body itself "caused" the deprivation of the plaintiff's constitutional rights. Bryan County, 520 U.S. at 403.

7

The plaintiff's claim is that the school board's facially lawful decision to retain Crute as a teacher after the Kirman investigation and not to take special precautions to prevent future improper conduct by him caused a violation of her constitutional rights. She relies primarily upon the 1988-89 videotaping of team members, the school's "progressive discipline" policy, its allegedly inadequate investigation of those incidents, and its conduct following the investigation.

The school board responds that, as a matter of law, these matters of Crute's conduct prior to the secret videotaping were insufficient to establish the necessary violation of a duty to the plaintiff and a causal connection between the board's conduct and the subsequent deprivation of the plaintiff's federal rights. We agree with the school board.

In Bryan County, a sheriff's facially lawful decision to hire a deputy sheriff without proper investigation of his background was claimed to have caused a violation of the plaintiff's § 1983 rights when the deputy sheriff assaulted her upon her arrest.[2] 520 U.S. at 399-400. In

_____

[2] Bryan County stipulated that the sheriff was the final "decisionmaker" for the county in the hiring matter. As such, the Court held that his actions fairly could have

8

reversing the lower courts' affirmation of a jury's verdict against the county for such alleged violations, the Court noted that § 1983 does not impose liability on a county under traditional employer-employee relationships with an employee tortfeasor. Instead,

> [a] plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

520 U.S. at 404 (second emphasis added).

Thus, although a governmental body may have been negligent in regard to the plaintiff's federal rights, in order to show that it "caused" the violation of those rights, "[a] plaintiff must demonstrate that [the governmental] decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." 520 U.S. at 411. And, the required "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." 520 U.S. at 410.

---

been treated as actions of the county. Bryan County, 520 U.S. at 403-04.

9

Reasonable persons might conclude that Crute should have been discharged or more carefully monitored after the Kirman investigation.  However, in our opinion, the evidence is insufficient to support a conclusion by reasonable persons that the above-described school board actions reflected the required deliberate indifference to the risk that he would violate the plaintiff's § 1983 rights in the manner alleged.  Therefore, we hold, as a matter of law, that the school board did not cause the violation of the plaintiff's § 1983 rights.

Accordingly, we will reverse the judgment of the trial court against the school board and enter final judgment here for the school board.

<u>Reversed and final judgment</u>.